UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMOS DON </br></br> Petitioner, </br></br> v. </br></br> NELSON B. ALVES, SUPERINTENDENT </br></br> Respondent. | Case No. 21-CV-10468-AK |

**MEMORANDUM AND ORDER ON
PETITION FOR WRIT OF HABEAS CORPUS**

**ANGEL KELLEY, D.J.**

This is an application for a writ of habeas corpus filed by a person in state custody, pursuant to 28 U.S.C. § 2254.  Petitioner Amos Don ("Don" or "Petitioner") was convicted of first-degree murder and related charges in Massachusetts Supreme Judicial Court ("SJC") in 2013.  After having exhausted his state court remedies, Don now seeks federal relief on grounds of ineffective assistance of counsel and actual innocence based on newly discovered evidence.  Don also requests an evidentiary hearing in connection with his claims.  The Commonwealth filed a response in opposition to the habeas petition [Dkt. 18], and Petitioner subsequently submitted a reply brief.  [Dkt. 22].  For the reasons set forth below, the petition is **DENIED**.

I.    **FACTUAL AND PROCEDURAL HISTORY**

In the absence of clear and convincing evidence of error, the Court must defer to the factual findings of the Massachusetts state courts and presume them to be correct.  28 U.S.C. § 2254(e)(1).  Thus, the description of the facts is taken primarily from Commonwealth v. Don,

1

136 N.E. 3d 680 (2019), but the Court's recitation is "supplemented with other record facts consistent with the SJC's findings." Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006) (citation omitted).

Shameek Garcia ("Garcia") and his girlfriend Erica Field ("Field") met Don, whom they knew as "Ace," in early August of 2009. Commonwealth v. Don, 136 N.E. 3d 680, 684 (2019). Garcia had originally met Don at a house in Lewiston, Maine, where people would go to buy drugs. Id. Don had traveled from his home in Boston to Lewiston to sell cocaine and heroin. Id. Garcia and Don began working together because Garcia was familiar with the drug market in Lewiston and Don was not. Id. In exchange for cocaine, Garcia also arranged for Don to stay with Donald and Deann Dyer in Lewiston. Id. Don kept his supply of drugs in his bedroom at the Dyers' house. At around that time, Don tried to have a woman named Christine Gilleland ("Gilleland") buy three firearms for him, but her application for the firearms was denied. Id.

About a week before Field's murder, Don discovered some of his heroin, for which he still owed his suppliers $6,000, was missing. Id. at 684. He initially suspected that a local heroin user and friend of Garcia and Field's, Samantha Leonard ("Leonard"), was the thief. Id. He told Garcia that "if it took him a year or two, he'd put [Leonard] in a box." Id. The following day when Don confronted Leonard about the missing heroin, she implied Garcia was the one who had actually stolen it. Id. at 685.

At around this time, Don made a second attempt to purchase a firearm. Id. He successfully obtained a .45 caliber pistol that was missing a clip. Id. The salesperson at the gun shop told Don that without a clip, however, a bullet could not be loaded in the chamber. Id. Shortly after, Don and Garcia agreed to travel together to Boston to refill Don's supply of cocaine and to get an extension to repay his supplier. Id. Since Garcia did not have a valid

driver's license, they decided Field should accompany them. Id. On August 25, 2009, the three drove from Lewiston to Boston in a red Ford sedan, with Field in the front passenger seat and Don in the rear driver's side seat. Id. After having "found somebody" to supply cocaine, Don directed Garcia where to drive and at some point, they began following a silver sedan. Id. At that time, Garcia gave Don the cash he had brought to buy the cocaine. Id.

The two vehicles came to a stop in a lot on Norwell Street in Dorchester. Id. Don exited the Ford and got into the silver sedan where he stayed for a few minutes before getting out and getting back into the back seat on the driver's side of the red Ford. Id. The last thing Garcia remembers before waking up in the hospital is turning around toward the back seat and asking Don if they were "all set." Id.

Following reports of gunshots, Sergeant Detective Sean Doherty ("Doherty") arrived at the scene. Id. Doherty saw Garcia walk around the front of the car from the doorway of the front driver's side door to the front passenger side and dive headfirst onto Field's lap. Id. He then fell out of the vehicle onto the ground. Id. Doherty asked Garcia, "Who shot you?" and Garcia replied, "Ace." Id. Doherty then asked what Ace's real name was and where he lived, but Garcia kept repeating "Ace." Id. As Garcia's mouth began to fill with blood, Doherty stopped asking questions because he believed that based on Garcia's condition, he was not going to get a different answer; therefore, there was "no need to go any further." Id.

Phone records, including cell site location information, confirmed Don traveled to the area of the crime at the time of the shooting. Id. at 685-86. Fingerprint analysis of the red Ford showed two of Don's fingerprints were on the rear driver's side window. Id. Ballistics evidence showed that the bullets recovered from Field's body and the front passenger side door were from the same firearm. Id.

3

According to the medical examiner, Mindy Hull ("Hull"), wounds to Field's left hand and left nostril could have been caused by a single bullet, as Field held her left hand up to her face.  Id.  Hull testified that the wounds to Field's nose and hand showed "stippling," and that the wound behind Field's left ear had "soot deposition," indicating that the firearm was shot within two or three feet of Field.  Id.  A second bullet entered Field's head, fragmented and bisected her brain stem, stopped in the right side of the cerebellum, and killed her.  Id.

Based on his medical records, Hull also testified that Garcia had multiple facial fractures to the right side of his face and "traumatic contusion of the right temporal lobe" of his brain.  Id.  Some of Garcia's medical records describe him as having been "shot in the head" with "bullet fragments within the sinus and nasal cavities."  Id.  The records state that the principal diagnosis of his injuries was a gunshot wound to the right side of his face.  Id.

On the day of the murder, a close friend of Field's, Misty Deschaine ("Deschaine"), called Don to find out what had happened to Field and Garcia.  Id.  Don denied knowing who they were.  Id.  Over the course of the next few days, Deschaine continued calling Don, and at one point she confronted him about the murder.  Don replied, "you cannot play with someone else's money . . . or something bad will happen."  Id.  The day after the murder, Don asked his sister-in-law to change his telephone number, telling her his son's mother, Fabiola Ramponeau ("Ramponeau"), was harassing him.  Id.  That same day, however, Don visited Ramponeau and gave her the sneakers he had purchased for their son during his trip from Lewiston.  Id.  He also stayed with Ramponeau twice the week after the murder.  Id.

When Gilleland confronted Don about whether he had shot Garcia and Field, he replied, "they would have to prove it."  Id.  After Gilleland told him she might be pregnant with his child, Don replied that she would not want to have a child with someone like him because "[she] knew

4

what type of person that he was, and that he could end up doing life in jail" and that "he might have to kill innocent people." Id. at 686.

After a jury trial, Don was convicted of (1) first degree murder; (2) aggravated assault and battery by means of a dangerous weapon; (3) armed assault with intent to murder; and (4) unlicensed possession of a firearm. Id. at 686-87. He was sentenced to life in prison for murder and to a concurrent sentence related to the other indictments. Id. He timely appealed and filed a motion for a new trial with the SJC on April 25, 2017, which was remanded to the Superior Court ("the trial court"). Id. Don argued that his trial counsel provided ineffective assistance of counsel for failing to do the following: (1) use evidence that Garcia was a government informant to rebut the prosecutor's argument that only Don had a motive to shoot Garcia; (2) challenge the reliability of a Garcia's statements; and (3) challenge expert testimony presented by the government regarding the trajectory of one of the bullets that got lodged in the red Ford. Id.

After filing the motion, Don's postconviction counsel realized that additional medical records existed that had not been previously produced during pretrial discovery. Id. On October 13, 2017, a regional administrative judge ordered the production of these outstanding medical records. Id. Don's motion for a new trial was dismissed on November 29, 2017. Id. In light of the newly obtained medical records, Don's postconviction counsel filed a motion for an emergency status hearing and a motion to reconsider the dismissal of the new trial motion on January 25, 2018. Id. at 687. After considering the additional evidence offered, the regional administrative judge denied the motion to reconsider and did not grant an evidentiary hearing. Id. Don appealed. Don's direct appeal was consolidated with the appeal from the denial of his motions for a new trial and motion for reconsideration. Id. Don alleged all the claims he raised in his postconviction motions and additionally argued that the trial judge committed reversible

error in admitting evidence of Don's previous unsuccessful attempts to purchase firearms that could not have been the murder weapon. Id. at 688. On December 20, 2019, the SJC affirmed Don's convictions and denied his postconviction motions. Id. at 680.

Don filed this petition for habeas corpus on March 18, 2021, arguing that his trial counsel provided him with ineffective assistance of counsel based on three main reasons: failure to challenge Garcia's capacity to respond to questions immediately after being shot [Dkt. 14 at 12-14]; failure to challenge ballistics evidence that supported the Commonwealth's case [Id. at 28-35]; and failure to pursue and introduce third-party culprit evidence. [Id. at 35-48]. Don also argues that newly discovered evidence—i.e., the additional medical records—is so compelling that it would be "a denial of due process to deny him the opportunity to present this evidence to a jury." [Id. at 48]. In the alternative, Don argues he deserves an evidentiary hearing. [Id. at 62-65].

## II.   LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), a petitioner may obtain habeas relief in two ways. First, the Petition must show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court decision is "contrary to" clearly established federal law if it "(1) arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 364-65 (2000). In either scenario, the state court decision

must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent. Id. at 405.

A state court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions but applied it in an objectively unreasonable manner. Id. at 409. The Supreme Court has warned that "[a]n unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410. The state court's application of federal law must be "more than incorrect or erroneous." Id. at 412; see also Harrington v. Richter, 562 U.S. 86, 88 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of that decision.") (internal quotations omitted).

Alternatively, a petitioner's habeas petition can be granted if they show that the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under 28 U.S.C. § 2254(e)(1), the "state court's factual findings are presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence." Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012).

The burdens created by the AEDPA are designed to "ensure that federal habeas relief will be granted only in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents." Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018). "A federal court may not overrule a state court for simply holding a view different from its own." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). Ultimately, habeas corpus is meant to protect petitioners from "extreme malfunctions in the state criminal justice

systems." Jackson v. Virginia, 443 U.S. 307, 322 n.5 (1979). It is not meant as a "substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (2011) (citation omitted).

### III.   DISCUSSION

#### A.   Ineffective Assistance of Counsel

Don's ineffective assistance of trial counsel claim subdivides into three actions that trial counsel failed to do: investigate Garcia's capacity to respond to questions immediately after being shot [Dkt. 14 at 12-14]; challenge ballistics evidence that supported the Commonwealth's case [Id. at 28-35]; and pursue and introduce third-party culprit evidence. [Id. at 35-48].

To establish ineffective assistance of counsel, the petitioner must first demonstrate "that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 667, 687 (1984). In other words, "counsel's representation fell below an objective standard of reasonableness." Id. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. "It is only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it that the ineffective assistance prong is satisfied." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006).

"Second, the defendant must show that the deficient performance prejudiced the defense" such that "counsel's errors were so serious as to deprive the defendant of a fair, [reliable] trial." Strickland, 466 U.S. at 687. With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some

8

conceivable effect on the outcome of the proceeding." Id. at 693.  The chances "of a different result must be substantial, not just conceivable."  Harrington, 562 U.S. 86, 112 (2011).

"In the context of a federal habeas proceeding, claims of ineffective assistance of counsel present mixed questions of law and fact which are reviewed under § 2254(d)(1)'s 'unreasonable application' clause."  Smith v. Dickhaut, 836 F.3d 97, 103 (1st Cir. 2016).  Thus, the question is not whether there was a violation of Strickland, but rather whether the SJC's application of Strickland was unreasonable.  "When combined with Strickland's already highly deferential standard for a trial attorney's conduct on de novo review, the AEDPA standard is doubly so, requiring the court to ask whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington, 562 U.S. at 105 (internal quotations omitted).

Here, the SJC did not apply Strickland, but rather the state standard for first-degree murder cases.  Under that standard, the SJC evaluated "for a substantial likelihood of a miscarriage of justice by asking whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion."  Commonwealth v. Barnett, 125 N.E.3d 724, 730 (2019).  The First Circuit has recognized this standard to be "at least as generous to the defendant as the federal ineffective assistance of counsel standard."  Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004).  Therefore, this Court presumes the federal law adjudication to be subsumed within the state law adjudication and considers the SJC's analysis as having been adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 301 (2013) ("if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits.").  Thus, the state court's decision is entitled to AEDPA deference.

1. **Garcia's Ability to Respond to Questions After Being Shot**

Don's first ineffective assistance of counsel claim is based on trial counsel's failure to present expert testimony to challenge "Garcia's capacity to answer questions or the reliability of his memory." [Dkt. 14 at 13]. Don argues that Garcia's response to the question, "Who shot you?" was of crucial importance. [Dkt. 14 at 20]. Thus, Petitioner contends, trial counsel had an obligation to investigate this evidence and explore expert assistance [id.], and failure to do so "clearly prejudiced Don because Garcia was the only eyewitness to inculpate Don." [Id. at 25]. In support of this, postconviction counsel submitted an affidavit from a neurologist, Ryan Darby, who stated that the injury to Garcia's frontal lobe, the extreme blood loss, or a combination of both, "affect[ed his] decision-making ability" and that "answering a question reliably is a form of decision-making." Don, 136 N.E. 3d at 691.

Without addressing whether such expert testimony would have been admissible, the SJC found that the jury was "already presented with testimony about Garcia's inability to answer Doherty's questions appropriately," id., which then enabled defense counsel to argue in closing:

> [The word 'Ace' is] an answer correctly to one question only. So there is the possibility based on the testimony of Sergeant Doherty and based on your review of the medical records of Mr. Garcia that you will see and based up[on] his testimony and your observations of him that he just couldn't remember, just couldn't remember . . . . So when Mr. Garcia answered the word 'Ace' to Sergeant Doherty . . . I suggest most respectfully . . . you can't rely on what the answer was that Mr. Garcia [gave] to that particular series of questions, the same one, at that particular time especially now based on the testimony of Mr. Garcia that he cannot remember anything that happened after Ace got back into the car on August 25, 2009.

Id. This Court disagrees with the SJC's conclusion that expert testimony "would have only incrementally advanced a defense theory that was already before the jury." Id.

Even people without neurological injuries might struggle to remember facts of an event after slipping into a coma or at trial, three and a half years after the incident. There is an immense difference between not remembering an important detail much later and an individual's

10

capacity to answer questions at all, moments after being shot. Garcia's inability to follow commands as a result of the injury to his frontal lobe, extreme blood loss, or both [Dkt. 9 at 138], was not presented to the jury at trial. Moreover, how Garcia's neurological injuries affected his ability to answer questions is not an issue jurors could have been expected to evaluate without expert testimony. As Petitioner points out, it is not obvious "that the frontal lobe controls decision-making but not speech, and therefore that an injury to the frontal lobe could affect a person's ability to answer questions, but not his ability to speak." [Dkt. 22 at 7]. Thus, expert testimony could have significantly strengthened defense counsel's argument that the word "Ace" may not have been an answer to any of Doherty's questions.

At the start of the case, defense counsel knew Garcia was the only witness identifying Don as the shooter; that Garcia had suffered from a gunshot wound to the head causing severe damage to the right temporal lobe of his brain; and that undermining Garcia's cognitive abilities and credibility was of utmost importance to defense counsel's chosen strategy. Prior to trial, defense counsel received Garcia's medical records describing his hospitalization and treatment immediately after the shooting. [Dkt. 14 at 14]. He also received police reports and testimony detailing Garcia's erratic behavior at the scene. [Id.]. Yet defense counsel did not introduce expert testimony to counter the Commonwealth's argument that Garcia correctly answered Doherty when he asked who shot him. In an April 2017 affidavit, defense counsel admitted:

> I believed that the Commonwealth's case gained significant strength from Mr. Garcia's utterance of the word "Ace," following the question "Who shot you?" from a police officer . . . especially in such a circumstantial case . . . It did not occur to me to consult with an expert to evaluate the significance of Mr. Garcia's medical condition at the time he was shot, or to review his medical records. I did not make any independent efforts to investigate the neurological impact of Mr. Garcia's injuries. . . . I did not have a tactical reason for not consulting an expert.

[Dkt. 9 at 128]. As the Supreme Court stated in Strickland, "strategic choices . . . are reasonable precisely to the extent that reasonable professional judgments support the limitations on

investigation." 466 U.S. at 690-91. Here, no "reasonable professional judgments" supported defense counsel's failure to consult or introduce expert testimony regarding Garcia's cognitive impairment. "The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." Dunn v. Jess, 981 F.3d 582, 591 (7th Cir. 2020); see also Rompilla v. Beard, 545 U.S. 374, 396 (2005) (O'Connor S.D., concurring) (stating that defense attorneys' inactions, which were not based on reasoned strategic judgment, "fell below constitutionally required standards").

Failure to consult an expert witness because it did not occur to trial counsel in this setting is inadequate performance and was objectively unreasonable under prevailing professional norms. See generally, Dugas v. Coplan, 428 F.3d 317, 327-32 (1st Cir. 2005). Although this Court finds trial counsel's failure to be professionally unreasonable, the SJC's judgment cannot be disturbed unless Petitioner shows that but for the error, there is a reasonable probability that the outcome would have been different. Strickland, 466 U.S. at 694.

The SJC found that even if expert testimony explaining why "Ace" was not an answer to the question "Who shot you?" had strengthened defense counsel's argument, such testimony would have been "unable to draw the sting out of the fact that the defendant's name was the word Garcia repeated over and over again moments after he was shot." Don, 136 N.E. 3d. at 692. Thus, the SJC, concluded, defense counsel's "failure to call a neurological expert did not create a substantial likelihood of a miscarriage of justice." Id.

Here, "fairminded" jurists and "reasonable minds" at best could disagree as to whether expert testimony about Garcia's capacity to answer Doherty's questions would have been likely to influence the jury's ultimate conclusion, given the other circumstantial evidence against Don. See White v. Woodall, 572 U.S. 415, 427 (2014) (stating that the Court can only grant habeas

relief "if, and only if . . . there could be no 'fairminded disagreement' on the question.") (quoting Harrington, 562 U.S. at 103); see also Ayala v. Alves, 85 F.4th 36, 63 (1st Cir. 2023) (stating that even if missing medical records would have provided trial counsel a stronger defense argument, petitioner had only shown "at most, that 'fairminded' jurists and 'reasonable minds' could disagree.") (citation omitted).  In such a circumstance, this Court cannot conclude that the SJC's application of Strickland was unreasonable under 28 U.S.C. § 2254(d).

### 2. The Ballistics Evidence Supporting the Commonwealth's Case

Don next alleges that he received ineffective assistance of counsel because defense counsel failed to challenge ballistics evidence that supported the Commonwealth's theory that Garcia and Shield were shot from the back seat of the car. [Dkt. 14 at 28].  Petitioner relies on a post-conviction affidavit of Gregory Danas, a firearms expert, who stated that it was possible that the shots fired could have come from someone standing outside the car or from two different shooters.  Don, 136 N.E.3d at 692.  While Danas' affidavit provides alternative theories to the Commonwealth's, it does not contradict the Commonwealth's theory or discredit the testimony that a criminalist, medical examiner, and detective with the Boston Police Firearm Analysis Section provided regarding the ballistics evidence.  Danas merely stated, "[i]t is reasonably possible that the shots fired in this case originated from someone standing," or "that the shots were fired from two different shooters."  [Dkt. 9 at 142].

It is perhaps for this reason that trial counsel pursued other defense strategies and decided not to challenge the ballistics evidence.  This is further supported by trial counsel's affidavit, in which they state that they "believed that the forensic evidence was not helpful to the defense so [they] tried to stay away from it."  [Dkt. 9 at 295].  See Harrington, 562 U.S. at 108 (finding that even if expert testimony could have supported the petitioner's defense, "it would be reasonable

to conclude that a competent attorney might elect not to use it."); see also Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

As the SJC notes, "Merely offering the possibility of another scenario, based on an incomplete accounting of the evidence, is insufficient to meet the defendant's burden to show that the proffered evidence 'was likely to have influenced the jury's conclusion.'" Don, 136 N.E.3d at 693.  See Harrington, 562 U.S. at 112 ("It was reasonable to find [that petitioner] had not established prejudice given that he offered no evidence directly challenging other conclusions reached by the prosecution's experts.").  Thus, Don's trial counsel was not ineffective when they failed to challenge the ballistic evidence, and the SJC reasonably concluded that there was no substantial likelihood of a miscarriage of justice.

### 3. Third-Party Culprit Evidence

Don argues that his trial counsel should have pursued and introduced evidence that Garcia was an informant for the Federal Drug Enforcement Administration (DEA) in support of a third-party culprit defense.  Don, 136 N.E. 3d at 693.  Before trial, defense counsel received materials from the prosecutor revealing Garcia's status as a paid DEA informant as well as other discovery "arguably suggesting a potential third-party culprit defense."  Id.  While the SJC concedes that trial counsel failed to follow up on this information or to interview anyone regarding the evidence in question, the court determined that the evidence would not have been admissible anyway because it failed to meet the standard for admissibility of third-party culprit evidence.  Id. at 694.

The Supreme Court has made clear that "federal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  In other words, "it is not the

14

province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 63 (1991). Rather, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68. See Collins v. Roden, 749 F.3d 29, 32 (1st Cir. 2014) ("If the evidence would likely not have been admitted, it was not unreasonable for the [state court] to conclude that the failure to proffer it in the face of opposition by the prosecution and a skeptical trial judge did not have a 'substantial likelihood of affecting the trial.'"). Therefore, Petitioner's claim regarding third-party culprit evidence does not provide a proper basis for federal habeas relief.

### 4. Cumulative Error

Don also argues that the Court "must consider the cumulative effect of his trial counsel's unreasonable performance in deciding whether [he] was prejudiced." [Dkt. 14 at 57]. However, the First Circuit has repeatedly stated that "[a]bsent any particularized error, there can be no cumulative error." Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998). Because the Court finds no prejudice on any of the three purported errors above, Don is not entitled to relief on his cumulative error claim.

### B. Newly Discovered Evidence

In addition to his ineffective assistance of counsel claims, Don alleges that the additional medical records postconviction counsel obtained demonstrate that Garcia was shot in the mouth; thus, "Garcia could not have been shot by someone sitting directly behind him." [Dkt. 14 at 48]. In other words, Don contends that the medical evidence produced after trial constitutes newly discovered evidence that establishes his innocence. As the Petitioner himself notes, the Supreme Court has never held that a claim of actual innocence is a sufficient basis for habeas relief without an underlying constitutional violation. Herrera v. Collins, 506 U.S. 390, 400 (1993); see

also David v. Hall, 318 F.3d 343, 347-48 (1st Cir. 2003) ("The actual innocence rubric . . . has been firmly disallowed by the Supreme Court as an independent ground of habeas relief, save (possibly) in extraordinary circumstances in a capital case."). The Supreme Court made an exception to this in McQuiggin v. Perkins, 569 U.S. 383 (2013) by holding that a showing of actual innocence can serve as a "gateway" that allows an otherwise procedurally barred petition to be considered where a petitioner proffers new evidence that meets the standard set forth in Schlup v. Delo, 513 U.S. 298 (1995). McQuiggin, 569 U.S. at 386. However, Don has not asserted such an actual innocence gateway claim here.

In addition, Petitioner's innocence claim has not been fully exhausted. Before the SJC, Don argued that he was entitled to a new trial because the additional medical records postconviction counsel obtained constituted newly discovered evidence under the standard set forth in Commonwealth v. Grace, 491 N.E.2d 246, 248 (1986). Don, 136 N.E.3d at 688. At that time, he never raised the federal due process argument he raises here. Thus, Petitioner's freestanding actual innocence claim fails on this basis as well.[1]

Lastly, since Don presented his newly discovered evidence claim under state law, the Court cannot reevaluate the SJC's conclusion. As previously mentioned, the Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

---

[1] A federal district court cannot adjudicate a habeas petition containing both exhausted and unexhausted claims. Rose v. Lundy, 455 U.S. 509, 518-19 (1982). Rather than dismissing a mixed petition, however, a district court can stay a petition while the petitioner exhausts their unexhausted claims. See Rhines v. Weber, 544 U.S. 269, 275 (2005). However, Petitioner has not shown good cause for his failure to exhaust, and this Court is unaware of any. See id. at 277 (stating "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court."). In addition, there is a one-year statute of limitations for the filing of fully exhausted claims in a federal habeas petition and the AEDPA did not provide for the tolling of the limitations period while a habeas petition is pending in federal court. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Because Don's claim would fall outside the one-year statute of limitations if given the opportunity to exhaust it in state courts, stay and abeyance would not be appropriate here.

### C.  Evidentiary Hearing

Where not explicitly prohibited by § 2254, federal judges reviewing habeas petitions retain discretion to grant evidentiary hearings. Atkins v. Clarke, 675 F. Supp. 2d 200, 203 (D. Mass. 2009); see Cullen v. Pinholster, 563 U.S. 170, 183 (2011) (stating that "when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'"). However, a court's discretion on this matter should be exercised with restraint. "Federal evidentiary hearings seeking to rehear issues addressed by the state courts 'ought to be the exception, not the rule.'" Teti v. Bender, 507 F.3d 50, 61 (1st Cir. 2007) (quoting Pike, 492 F.3d at 70). "Section 2254(e)(2)'s bar applies where there has been a 'lack of diligence' on the part of the petitioner or his counsel before the state courts." Id. at 60 (quoting Williams v. Taylor, 529 U.S. 420, 430 (2000)). Here, however, Petitioner was diligent in pursuing his claims in state court, so the bar does not apply. Specifically, Don (1) argued ineffective assistance of counsel in his new trial motion, Don, 136 N.E. 3d at 687; (2) provided affidavits by both his trial and current counsel [Dkt. 9 at 125-131, 117-120]; and (3) timely filed appeals to the Suffolk Superior Court and the SJC. Don, 136 N.E. 3d at 686.

"Even though there is no statutory bar, the court must still determine whether Petitioner has shown that this is an exceptional situation warranting an evidentiary hearing." Atkins v. Clarke, 675 F. Supp. 2d 200, 204 (D. Mass. 2009). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). Regarding ineffective assistance of counsel claims, a petitioner "must allege more than that he received inadequate assistance; he

17

must allege facts sufficient to overcome AEDPA deference to the state court's factfindings and legal conclusion to the contrary." Teti v. Bender, 507 F.3d 50, 62 (1st Cir. 2007).

This habeas petition was reviewed under Section 2254(d)(1), which refers to "a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law." Cullen v. Pinholster, 563 U.S. 170, 182 (2011). Consequently, this Court's review is "limited to the record in existence at that same time i.e., the record before the state court." Id. The SJC adjudicated Don's ineffective assistance of counsel claims on the merits, and this Court cannot second-guess the SJC's interpretation of Massachusetts law regarding the medical records that postconviction counsel obtained. As previously explained, based on the state court record, this Court agrees with the SJC and finds that Don was unable to establish ineffective assistance of counsel. By extension, Don would not be able to prove his petition's factual allegations at an evidentiary hearing. Therefore, an evidentiary hearing is not warranted here.

## II. CONCLUSION

For the foregoing reasons, Don's petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**

Dated: March 26, 2024 /s/ Angel Kelley
Hon. Angel Kelley
United States District Judge